## TAYLOR v. KERCHEVAL.

### (Circuit Court, D. Indiana. September 28, 1897.)

### No. 9,475.

1. JURISDICTION OF FEDERAL COURTS -- REMOVAL OF OFFICERS -- EXECUTIVE FUNCTIONS.

   The national courts cannot rightfully interfere with executive action in any case where an executive officer is authorized to exercise judgment or discretion in the performance of an official act.

2. EQUITY JURISDICTION--INTERFERENCE WITH EXECUTIVE ACTION.

   Courts of equity concern themselves only with matters of property and the maintenance of civil rights, and have no jurisdiction in matters of an executive or political nature; nor do they interfere with the duties of any department of the government except under special circumstances, and then only when necessary to the protection of rights of property.

3. OFFICERS--POWER OF REMOVAL.

   The power to remove the incumbent of an office is incident to the power of appointment.

4. DEPUTY MARSHALS--POWER OF MARSHAL TO REMOVE.

   An office deputy of a United States marshal has no vested right of property in his office or employment, under the act of May 28, 1896. He is employed by the marshal, and his tenure of office terminates with the expiration of the marshal's official term; and a court of equity has no jurisdiction to restrain the marshal from removing him.

5. SAME--CIVIL SERVICE LAW--EXECUTIVE RULES.

   The rules promulgated by the president which place office deputies in the marshal's office in the classified civil service list are not a statute, nor have they the force of law. They are merely executive rules and regulations by authority of law, and are effective, if at all, only for the internal control and government of the civil service and the executive departments. The courts of equity have no jurisdiction or authority to enforce them.

Holstein & Hubbard, Henry Warrum, and J. M. Berryhill, for complainant.

Hawkins & Smith and Albert W. Wishard, for defendant.

BAKER, District Judge. This is a suit by the complainant, Charles P. Taylor, an office deputy employed in the office of the marshal of the district of Indiana, to enjoin the defendant, Samuel E. Kercheval, as such marshal, from removing him from his office or employment as such office deputy. The bill sets forth that the complainant is a United States deputy marshal for the district of Indiana, and is an office deputy; that in October, 1896, he was appointed to such office, and duly qualified as such officer by taking the required oath of office, and has since then discharged the duties thereof, and is still such United States deputy marshal; that on the ———— day of ————, 1896, in accordance with the order and direction of the president of the United States, the attorney general of the United States revised the existing classification of the offices and positions in the department of justice so as to include the office occupied by the complainant within the classified list of those entitled to the benefit of the civil service laws of the United States and the rules and regulations thereunder; that in November, 1896, the president of the United States, by an executive order, as provided by law, extended the

82 F.—32

civil service laws, rules, and regulations to the position occupied by the complainant, and declared and provided that the operations of the said civil service laws, and the rules and regulations promulgated thereunder, should cover and include the position of office deputies of the United States marshals and incumbents thereof, and that, under the laws of the United States, the office and position of office deputy of the United States marshals are under the civil service laws, rules, and regulations, and are governed thereby; that in March, 1897, the defendant, Samuel E. Kercheval, became and was duly appointed and qualified as United States marshal for the district of Indiana, and is now such marshal; that the defendant proposes and threatens to remove the complainant from his said office and position, and to prevent him from exercising the duties thereof; that he has announced and declared his intention to oust and remove the complainant from his office and position as office deputy marshal, and has notified, threatened, and warned him that on August 1, 1897, he would remove him, and would thereafter refuse and decline to let him serve or act as such deputy, and would decline to recognize or treat him as such, and would appoint another in his place and stead; that the complainant has always faithfully, diligently, and promptly discharged the duties of his said office, and has not given any cause for his removal, and in fact no cause exists for such removal, and the defendant alleges no cause for such proposed removal other than that the complainant is a Democrat in politics, and he intends to have none but a Republican in the said office; that the defendant does not complain in any way as to the faithfulness and carefulness with which the complainant has always discharged the duties of said office, and bases his intended action solely upon the political ground aforesaid; that the defendant will, unless restrained and enjoined by the order of the court, carry out his threatened purpose, and remove the complainant from his office, whereby he will suffer great and irreparable loss and damage consequent thereon; and that the complainant has no remedy at law, and, unless the court will grant him relief, he is remediless in the premises. The complainant prays for a temporary restraining order, and, on the final hearing, for a perpetual injunction. To this bill the defendant has interposed a demurrer, and insists that it discloses no case for injunctive relief.

Under our system of government, however it may be in the parent country, all offices are created by law, and exist for the public good, and not for private emolument. Honesty, capacity, and fitness, and not partisan activity, should determine the right to hold office, because the former qualities, rather than the latter, will afford the people an efficient public service. And, in so far as the civil service law tends to the securing of a better civil service, it will commend itself to the people; and it ought to receive, and I doubt not it will receive, from the judicial department, all the aid which, under the distribution of governmental powers in our national system, can be accorded to it. However ready the courts may be to aid in securing a better and more efficient civil service, they may not do this by overpassing the proper limitations of judicial authority.

Lying at the threshold of every suit brought in a court of the United States is the question of jurisdiction. National courts of equity have no jurisdiction over causes of action when there is a plain and adequate remedy at law. Nor, under the distribution of powers in the federal constitution, have the courts of law jurisdiction of questions of a legislative or executive character. It was settled, upon great consideration, in the case of Marbury v. Madison, 1 Cranch, 137, that the national courts cannot rightfully interfere with executive action in any case where an executive officer is authorized to exercise judgment or discretion in the performance of an official act. It is only in cases where an executive officer is required to perform a mere ministerial duty, involving no exercise of judgment or discretion, that the courts may control or direct the performance of such ministerial acts. The same doctrine is affirmed in Ex parte Hennen, 13 Pet. 230, and has never been doubted or denied. The appointment and removal of officers or employés involve the exercise of judgment and discretion, and have never, so far as the court is advised, been regarded or held to be mere ministerial acts.

But the jurisprudence of the United States has always recognized the distinction between common law and equity, under the constitution, as matter of substance as well as of form and procedure; and this distinction has been steadily maintained, although both jurisdictions are vested in the same courts. Fenn v. Holme, 21 How. 481; Thompson v. Railroad Co., 6 Wall. 134; Cates v. Allen, 149 U. S. 451, 13 Sup. Ct. 883, 977; Mississippi Mills v. Cohn, 150 U. S. 202, 205, 14 Sup. Ct. 75. It is firmly settled that courts of chancery concern themselves only with matters of property and the maintenance of civil rights. Such courts have no jurisdiction in matters of an executive or political nature; nor do they interfere with the duties of any department of the government except under special circumstances, and then only when necessary to the protection of rights of property; nor can they interfere to restrain criminal or immoral acts unless they affect or threaten to invade rights of property. In re Debs, 158 U. S. 564, 15 Sup. Ct. 900; Luther v. Borden, 7 How. 1; Mississippi v. Johnson, 4 Wall. 475; State of Georgia v. Stanton, 6 Wall. 50; In re Sawyer, 124 U. S. 200, 8 Sup. Ct. 482; Holmes v. Oldham, Fed. Cas. No. 6,643; Muhler v. Hedekin, 119 Ind. 481, 20 N. E. 700. "Neither the legislative nor the executive department," said Chief Justice Chase, speaking for the court, in Mississippi v. Johnson, supra, "can be restrained by the judicial department, though the acts of both, when performed, are, in proper cases, subject to its cognizance." And Mr. Justice Gray, speaking for the court in Re Sawyer, supra, said: "The office and jurisdiction of a court of equity, unless enlarged by express statute, are limited to the protection of rights of property." And it is clear that the complainant has in no just sense a right of property in his office or employment, for, if he had, congress would be powerless to abolish his office or to impair its tenure. To assume jurisdiction to control the exercise of executive or political powers, or to protect individuals in the enjoyment of purely political rights, would be to invade the domain of other departments of

the government, or to intrench upon the jurisdiction of the courts of common law.

In 2 Beach, Mod. Eq. Jur. § 670, it is said:

"The jurisdiction to determine the title to a public office belongs exclusively to courts of law, and equity has no jurisdiction over the appointment and removal of public officers, and will not interfere in cases of this character, even in a collateral or indirect proceeding, or in a bill to enjoin."

And the learned author cites cases too numerous to be inserted here, which fully support the text.

The same principle has been repeatedly announced by state courts of high authority. In Fletcher v. Tuttle, 151 Ill. 41, 37 N. E. 683, the supreme court of Illinois say:

"The question, then, is whether the assertion and protection of political rights, as judicial power is apportioned in this state between courts of law and courts of chancery, are a proper matter of chancery jurisdiction. We would not be understood as holding that political rights are not a matter of judicial solicitude and protection, and that the appropriate judicial tribunal will not, in proper cases, give them prompt and efficient protection; but we think they do not come within the proper cognizance of courts of equity."

To the same effect are In re Sawyer, supra; State of Georgia v. Stanton, supra; Sheridan v. Colvin, 78 Ill. 237; Dickey v. Reed, Id. 261; and Harris v. Schryock, 82 Ill. 119.

The general doctrine as to public officials is thus stated by the court of appeals of New York in the case of People v. Canal Board, 55 N. Y. 393:

"A court of equity exercises its peculiar jurisdiction over public officers to control their action only to prevent a breach of trust affecting public franchises, or some illegal act under color or claim of right affecting injuriously the property rights of individuals. A court of equity has, as such, no supervisory power or jurisdiction over public officials or public bodies, and only takes cognizance of actions against or concerning them when a case is made coming within one of the acknowledged heads of equity jurisdiction."

In the case of Muhler v. Hedekin, supra, the jurisdiction of a court of equity to enjoin the members of a common council of a city from, wrongfully and without authority of law, removing the water trustees of such city, was considered by the supreme court of Indiana in a learned opinion delivered by Mr. Justice Mitchell. The court there held that:

"Courts of chancery are not invested with power over the subject of removals of public officers, no matter in whom the power to make removals is vested."

It was declared that:

"The subject-matter of their jurisdiction relates to civil property. Injury to property, actual or threatened, is the foundation of chancery jurisdiction. It is not concerned with matters of a political nature. The general principle that equity possesses no power to revise, control, or correct the action of public, political, or executive officers or bodies is, of course, well understood."

After reviewing numerous authorities, the court further said:

"We by no means intend to assert that the duty may not be imposed upon the courts to determine whether or not the common council of a city may not have acted outside of its authority, when it has assumed to act upon matters not intrusted to it; or that courts will not, in proper cases and on proper ap-

plication, restrain inferior officers and bodies, and compel them to act within the limits of the law, when such officers or bodies are assuming to act upon matters not committed to their discretion; nor do we hold that an officer unlawfully removed or interrupted in the discharge of his official duties is remediless. What we mean to assert is that acts that are within the discretion of the governing body of a city, or acts which are absolutely void, and do not in some way affect or threaten individual property rights or the interest of taxpayers, are not subject to the control of courts of chancery. If, therefore, it were conceded that the common council of a city was about to proceed to hear charges preferred against an officer over whom it had no power or control whatever, with a view of adopting a resolution looking to his removal or expulsion from office, a case would not be presented for the exercise of the chancery powers of the court. Such a resolution would be without any effect whatever, and the law affords adequate means for the protection of one in office against mere harmless assumption, such as is supposed, without resorting to a court of equity."

If the marshal is vested with the power to remove his office deputies, a court of equity cannot interfere with his exercise of judgment and discretion in making such removal. If he is not possessed of such power, his act of removal is a mere harmless assumption, which will be treated as a nullity whenever and wherever drawn in question, without resorting to a court of equity. The court cannot assume that the attorney general or the president of the United States will not at once correct the wrongful act of the marshal when brought to his attention. The power and authority of the executive department are ample to correct all acts of usurpation or insubordination on the part of the marshal; and for this, if for no other reason, this court, as a court of chancery, is without jurisdiction.

Having reached the conclusion that the court is without jurisdiction, I might perhaps properly abstain from expressing any opinion upon other questions involved; but as those questions have been argued with learning and ability, and the court has been invited to do so, I will proceed to state my views briefly upon the merits of the controversy.

I think it too clear to admit of serious debate that prior to the act of May 28, 1896, the tenure of office of the deputy marshal was only co-extensive with that of the marshal, his principal, and expired when the term of the marshal expired, unless continued or enlarged by special provision of law. Such has been the understanding and practice of all departments of the government since the adoption of the constitution. The marshal was authorized to appoint one or more deputies, and their compensation, within certain limits, was a matter of contract between the marshal and the deputy. The deputy was empowered to act for the marshal, and his authority and power were limited by those of his principal. Provision was made for the payment of the deputy out of the fees which he earned, but those fees were due to and collectible by the marshal alone, and every official service or act of the deputy was performed in the name of the marshal. The bond of the marshal covered all official defaults and misfeasances, whether of the marshal in person or of his deputies. In the strictest sense, the deputy marshal was only authorized by the marshal to exercise the office or right possessed by him in his name, place, and stead.

In the judiciary act of September 24, 1789 (1 Stat. 73, 87), continued in force by sections 789 and 790, Rev. St. 1878, it is provided that:

"In case of the death of any marshal his deputy or deputies shall continue in office, unless otherwise specially removed, and shall execute the same in the name of the deceased, until another marshal shall be appointed and sworn; and the defaults or misfeasances in office of such deputy or deputies in the meantime, as well as before, shall be adjudged a breach of the conditions of the bond given by the marshal who appointed them; and every marshal or his deputy when removed from office, or when the term for which the marshal is appointed shall expire, shall have power notwithstanding to execute all such precepts as may be in their hands respectively at the time of such removal or expiration of office."

In Powell v. U. S., 60 Fed. 687, it is ruled that a deputy marshal is not such an officer of the United States as can maintain a suit against the United States for services rendered by him, and that for such services he must look to the marshal who employed him, and for whom he rendered the services for which he brings suit.

And in Douglas v. Wallace, 161 U. S. 346, 16 Sup. Ct. 485, it is held that:

"The claims of deputy marshals against the marshals for services stand upon the same footing as those of an ordinary employé against his employer."

And if the position of a deputy marshal under the judiciary act of 1789 had been that of one holding office in his own right, instead of being a mere employé of the marshal, his situation would have been no more favorable.

The supreme court of the United States, in Re Hennen, 13 Pet. 230, 258, held that:

"All offices the tenure of which is not fixed by the constitution or limited by law must be held either during good behavior, or (which is the same thing 'n contemplation of law) during the life of the incumbent, or must be held at the will and discretion of some department of the government, and subject to removal at pleasure. It cannot for a moment be admitted that it was the intention of the constitution that those offices which are denominated 'inferior offices' should be held during life. And, if removable at pleasure, by whom is such removal to be made? In the absence of all constitutional provision or statutory regulation, it would seem to be a sound and necessary rule to consider the power of removal as incident to the power of appointment. This power of removal from office was a subject much disputed, and upon which a great diversity of opinion was entertained, in the early history of the government. This related, however, to the power of the president to remove officers appointed with the concurrence of the senate; and the great question was whether the removal was to be by the president alone, or with the concurrence of the senate, both constituting the appointing power. No one denied the power of the president and senate jointly to remove where the tenure of the office was not fixed by the constitution, which was a full recognition of the principle that the power of removal was incident to the power of appointment."

In the case of Parsons v. U. S., 167 U. S. 324, 17 Sup. Ct. 880, there is an elaborate discussion of the power of the president to remove a district attorney of the United States before the expiration of the term for which he was appointed, and by and with the advice and consent of the senate to appoint his successor. In this case it was declared as the unanimous judgment of the supreme court that the president could lawfully remove a district attorney of the United States within the four years from the date of his commission, notwithstanding the stat-

ute explicitly provides that "district attorneys shall be appointed for a term of four years, and their commissions shall cease and expire at the expiration of four years from their respective dates." The statute was construed to mean that their tenure of office should not exceed four years, subject to the right of the president to remove them sooner. Even conceding the complainant to be an officer of the United States, and not an employé, the right of the president to remove him at any time is undoubted; and it would be an idle ceremony for the court to attempt to retain him in office when his removal rests exclusively in the discretion of the executive.

Such being the relation which a deputy bore to the marshal who appointed him, the question arises whether the act of May 28, 1896, has wrought any change in their relations in respect to the power of removal. In express terms, clearly, no change has been made, and an examination of that act will show that no change has been wrought by implication. The tenth section of that act provides as follows:

"Sec. 10. That when in the opinion of the attorney general the public interest requires it, he may, on the recommendation of the marshal, which recommendation shall state the facts as distinguished from conclusions, showing necessity for the same, allow the marshals to employ necessary office deputies and clerical assistance, upon salaries to be fixed by the attorney general, from time to time, and paid as hereinafter provided. When any of such office deputies is engaged in the service or attempted service of any writ, process, subpœna, or other order of the court, or when necessarily absent from the place of his regular employment, on official business, he shall be allowed his actual traveling expenses only, and his necessary and actual expenses for lodging and subsistence, not to exceed two dollars per day, and the necessary actual expenses in transporting prisoners, including necessary guard hire; and he shall make and render accounts thereof as hereinafter provided."

And the eleventh section of the act provides as follows:

"Sec. 11. That at any time when, in the opinion of the marshal of any district, the public interest will thereby be promoted, he may appoint one or more deputy marshals for such district, who shall be known as field deputies, and, who, unless sooner removed by the district court as now provided by law shall hold office during the pleasure of the marshal, except as hereinafter provided, and who shall each, as his compensation, receive three-fourths of the gross fees, including mileage, as provided by law, earned by him, not to exceed one thousand five hundred dollars per fiscal year, or at that rate for any part of a fiscal year; and in addition shall be allowed his actual necessary expenses, not exceeding two dollars a day, while endeavoring to arrest, under process, a person charged with or convicted of crime." 29 Stat. 182.

These sections provide for two classes of deputies, denominated, respectively, "field deputies" and "office deputies." We are not now concerned with field deputies. The marshal, under existing law, is required to recommend the appointment of one or more office deputies, stating the facts showing the necessity of their employment. when, if the attorney general is satisfied that such necessity exists, he may authorize the marshal to employ one or more office deputies at a salary to be fixed by the attorney general. All that the attorney general does is to determine whether office deputies shall be appointed, and to fix their compensation. When he has so determined, the marshal must appoint or employ such office deputies. The attorney general does not appoint or employ such deputies in any different sense than the congress does when it authorizes the marshal to em-

ploy deputies. It is clear that the appointment or employment of the office deputy is made by the marshal, just as certainly as such deputies were appointed by him before the act of May 28, 1896, became a law. It therefore follows that the marshal may remove his office deputies unless the rules and regulations of the civil service commission and their promulgation by an executive order have changed the law. U. S. v. Eaton, 144 U. S. 677, 12 Sup. Ct. 764.

It needs neither argument nor citation of authority to demonstrate that neither the president nor the civil service commission is clothed with legislative powers. Neither can change the law, either by repeal or by making a new enactment. And it is equally elementary that congress cannot delegate its legislative powers either to the president or the civil service commission. The rules promulgated which place office deputies in the marshal's office in the classified civil list are not a statute, nor have they the force of law. They are merely executive rules and regulations, promulgated by authority of law, and are effective, if at all, only as rules and regulations for the internal control and government of the civil service and the executive departments. The courts of chancery have no jurisdiction or authority to enforce such rules or regulations. Their enforcement lies within the domain of the executive departments, which possess ample power to enforce the proper observance of and subordination to the rules and regulations promulgated by the executive for the government of those employed in any executive department of the government. If the marshal, by the removal or threatened removal of the complainant, has violated, or is about to violate, those rules and regulations, there is ample power in the department of justice to redress the wrong, without any resort to a court of chancery. In the opinion of the court, the tenure of office or employment of the complainant terminated with the expiration of the official term of the late marshal, Hawkins, by whom he was employed; and this view is in accordance with the views held by the comptroller of the treasury and the present attorney general. It follows that the demurrer to the bill must be sustained, and, as the bill cannot be amended to state a good cause of action, it will be dismissed for want of equity, at complainant's costs.